IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| EVE M. DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:15CV387–HEH |
| | ) |
| JAMES V. HARNEY, JR., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**
(Cross Motions for Summary Judgment)

This civil rights action brought under 42 U.S.C. § 1983 evolved from Plaintiff's attempt to fill a prescription at a Wal-Mart pharmacy in Spotsylvania County, Virginia. Unfortunately, because the Virginia prescription data base reflected what the pharmacist thought to be a pattern of atypical activity, Plaintiff Eve Davis was arrested for prescription fraud. She was denied bail and detained in the local detention center for sixteen days. The charges were subsequently dismissed and this lawsuit followed.

By Memorandum Opinion issued on April 13, 2016 (ECF No. 168), this Court dismissed all claims against Defendants Brenda Greer (the Wal-Mart pharmacist) and Wal-Mart Stores East, L.P. Presently before the Court are Cross Motions for Summary Judgment addressing the single claim against Defendant James V. Harney, Jr., a Spotsylvania County Deputy Sheriff ("Deputy Harney").[1] Deputy Harney contends that Plaintiff's arrest was predicated on probable cause or, alternatively, that he is entitled to

---

[1] Deputy Harney is named as a defendant only in Count XI of the Amended Complaint, which alleges a violation of 42 U.S.C. § 1983 for an unlawful arrest.

qualified immunity because the constitutional standard for arrest under the circumstances at hand is ill-defined.

Plaintiff also seeks summary judgment, maintaining that Deputy Harney clearly lacked probable cause to arrest Plaintiff for prescription fraud and that his pre-arrest investigation was superficial at best. Plaintiff argues that because Deputy Harney's actions violated a clearly-established constitutional right, he is not entitled to qualified immunity.

Both parties have filed memoranda supporting their respective motion for summary judgment accompanied by relevant exhibits. This Court heard oral argument on May 9, 2016.

In reviewing cross motions for summary judgment, a district court must examine each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law." *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (internal citations omitted). Furthermore, when considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st. Cir. 1996); *see also Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "Summary judgment is appropriate only if the record shows 'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (citing Fed. R. Civ. P. 56(c)).

This Court's initial task is to parse out disputed peripheral facts and focus on the facts and circumstances that guided the actions of Deputy Harney at the time of Plaintiff's arrest. According to the Amended Complaint, the operative circumstances distill as follows.

On Saturday morning October 5, 2013, Deputy Harney of the Spotsylvania County Sheriff's Office was on routine patrol wearing his uniform. At approximately 11:14 a.m. that day, Deputy Harney received a communication from his dispatcher on the computer-aided dispatch system ("CAD") in his vehicle. The communication was as follows: "PRESCRIPTION FRAUD – CALLER TRYING TO FILL DUPLICATE PRESCRIPTION – ALREADY HAD IT FILLED AT CVS – PHARMACIST CHECKED THEIR SYSTEM – HAS BEEN DOING THIS SINCE APRIL." (Am. Compl. ¶ 60, ECF No. 93.) The dispatcher also advised Deputy Harney of the identity of the individual presenting the prescription, that the prescription was for a narcotic, and that she could be called back into the store if the deputy so requested. (*Id.* at ¶¶ 49–52.) Deputy Harney then advised the dispatcher by radio that he was in route to the Wal-Mart and that he would wait until he arrived at that location before the pharmacist was again contacted. Deputy Harney subsequently advised the dispatcher that he had "just confirmed with the pharmacist it's going to be multiples throughout the county, CVS and WalMart, but I'll take care of it like we talked about." (*Id.* at ¶¶ 86–87.) The Plaintiff denies that the pharmacist confirmed that Plaintiff was involved in multiple instances of prescription fraud throughout the County. (*Id.* at ¶ 88.) Deputy Harney also revealed to

3

the dispatcher that "the name they just put in my call now is for this lady . . . one of the one's that I've been looking for." (*Id.* at ¶ 67.)

Prior to his arrival at the Wal-Mart store, he contacted the pharmacist by telephone. During the conversation, the pharmacist advised Deputy Harney that the pharmacy needed more time to verify the prescription with the presenter's prescribing physician, Dr. Syed Ahmed ("Dr. Ahmed"). (*Id.* at ¶¶ 71–72.) During that conversation, the pharmacist did not tell Deputy Harney that the prescription was fraudulent, but indicated that the Prescription Monitoring Program ("PMP"), a computerized data base, was raising some "red flags" and "maybe we should check it out." (*Id.* at ¶¶ 73–75.) Deputy Harney relied upon the information provided by the pharmacist and undertook no independent investigation of the PMP data. (*Id.* at ¶ 77.)

The Amended Complaint also alleges that during this conversation, Deputy Harney asked the pharmacist to call Plaintiff back into the Wal-Mart store, to stall her at the pharmacy, to have someone meet him upon his arrival at a designated location, and to assist him in arresting Plaintiff by identifying her at the pharmacy counter. (*Id.* ¶¶ 79–81, 83–85.) After meeting a pharmacy technician,[2] Deputy Harney entered the Wal-Mart and proceeded to the pharmacy counter. Plaintiff, without prompting, had returned to the pharmacy to inquire about her prescription and was waiting in line. (*Id.* ¶¶ 101–102.) Deputy Harney stepped into the pharmacy line behind Plaintiff and engaged her in casual

---

[2] Deputy Harney informed the pharmacy technician that he had a large "stack" of paperwork on the Plaintiff. (*Id.* at ¶ 96.) This turned out to be incorrect; he had no such prior knowledge. (*Id.* at ¶ 98.)

4

conversation. The pharmacist then announced Plaintiff's name loudly and gestured in Deputy Harney's direction. (*Id.* ¶¶ 113–114.)

At this point, Deputy Harney advised Plaintiff she was under arrest, handcuffed her and escorted her to the loss prevention room where he interviewed her concerning the prescription. (*Id.* ¶¶ 115–116.) According to the Amended Complaint, prior to taking Plaintiff into custody, Deputy Harney did not confer with the pharmacist in person, examine the prescription, speak with Plaintiff, nor talk to the prescribing physician. He also failed to personally review information concerning Plaintiff's activities on the PMP computerized history. (*Id.* ¶ 120.) None of these assertions in the Amended Complaint appear to be in dispute.

Following his interview with Plaintiff, Deputy Harney transported her to the magistrate's office where a warrant was issued for violating Virginia Code § 18.2-258.1(A), namely attempting to obtain Adderall by fraud. (*Id.* ¶ 128.) Plaintiff was denied bond and remanded to jail where she remained for approximately sixteen days.[3]

On October 7, 2013, two days after Plaintiff's arrest, the Wal-Mart pharmacy staff was advised by Dr. Ahmed that Plaintiff's prescription was valid and that he approved of it being filled at the time it was presented. (*Id.* ¶ 136.) This information was not conveyed by the pharmacy to the sheriff's office but was presented to the Commonwealth's Attorney handling the case approximately two weeks later. (Am.

---

[3] Apparently Plaintiff had other pending felony charges at the time. However, the record fails to reveal what consideration was given to that fact by the magistrate.

5

Compl., Ex. A at 86:1–11.) It does not appear that Wal-Mart personnel were aware that Plaintiff remained in custody during that period.

On motion of the Commonwealth's Attorney, the charge against Plaintiff was amended to attempted possession of a Schedule II controlled substance with intent to distribute, in violation of Virginia Code § 18.2-248. A preliminary hearing on the amended charge was held on March 25, 2014 in the Spotsylvania County General District Court. After finding the requisite probable cause, the General District Court Judge certified the charge to the grand jury. Plaintiff was subsequently indicted on two felony charges. All charges against Plaintiff were later dismissed.

When considering cross motions for summary judgment filed pursuant to Fed. R. Civ. P. 56(c), the district court must review each motion separately to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Moreover, in considering each motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. It is well-established that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* at 247 (citing Fed. R. Civ. P. 56(c)). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

6

judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48.

As earlier noted, each party identifies perimetric facts with which they disagree.[4] Consequently, this Court's analysis will be cabined to only the specific information known to Deputy Harney at the time of Plaintiff's arrest, along with reasonable inferences drawn from his training and experience. Pivotal to both motions for summary judgment is whether Deputy Harney's actions violated the Plaintiff's constitutional rights under the Fourth Amendment or, alternatively, whether he is entitled to qualified immunity. Even if the Amended Complaint states a valid Fourth Amendment claim, recovery is barred when the conduct in question does not violate a "clearly established" constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Central to Plaintiff's Motion for Summary Judgment is her argument that not only did Deputy Harney act without probable cause, but that no reasonably trained law enforcement officer would believe that there were adequate grounds for her arrest. Plaintiff's evidence can be broadly characterized as having three significant components. First, Plaintiff highlights the comments of a circuit court judge in Spotsylvania County accompanying his suppression of post-arrest statements. Judge James Ellis, a respectable jurist, in commenting on the evidence then before him, concluded that there was no probable cause for the Plaintiff's arrest and that her constitutional rights were violated by

---

[4] In her Memorandum in Opposition to Defendant James V. Harney's Motion for Summary Judgment (ECF No. 184), Plaintiff disagrees with several facts relied upon by the Defendant, but offers little evidence to the contrary. In other instances, Plaintiff disputes the evidentiary weight it should be accorded. In its final analysis, the Court will attempt to parse out and rely only on those acts which appear to be undisputed.

her precipitous arrest. While Judge Ellis opined that the circumstances may have been sufficient for a *Terry* stop, they fell far short of what would be necessary to constitute probable cause for an arrest. Second, Plaintiff alleges that Deputy Harney failed to conduct an adequate investigation prior to placing her under arrest. She suggests that the underlying investigation conducted by Deputy Harney was inconsistent with the protocol established by the Virginia State Police for similar investigations. Third, Plaintiff maintains that the information known to the Deputy at the time of her arrest did not square with the elements of fraud articulated by trial courts and the Court of Appeals of Virginia.

In Plaintiff's view, the teachings of the Virginia Court of Appeals in *Williams v. Commonwealth*, 14 Va. App. 666, 418 S.E.2d 346 (1992) should have been instructive.[5] In *Williams*, the evidence proved that someone falsely representing himself to be a physician called a pharmacy and fraudulently prescribed a drug for a person named Sidney Johnson. When the defendant arrived at the pharmacy, he was confronted by a Special Agent of the Virginia State Police. Williams stated that he was picking up the prescription for another person. Williams was arrested and later convicted of prescription fraud. The Court of Appeals reversed the defendant's conviction for fraudulently obtaining a controlled substance in violation of Va. Code § 18.2-258.1. The court concluded that "[n]o evidence proved that Williams made the telephone call or knew that such a telephone call had been made." *Id.* at 668. While *Williams* is instructive in

---

[5] Within the Virginia court hierarchy, the Virginia Court of Appeals is an intermediate appellate court below the Virginia Supreme Court.

illuminating the necessity for proof of scienter beyond a reasonable doubt in prescription fraud cases, it sheds *only* faint light on whether the defendant's *arrest* contravened clearly established law.

While all of Plaintiff's points have arguable relevance, as stressed above, the focal point of the analysis, particularly in assessing entitlement to qualified immunity, is whether Deputy Harney's conduct violated clearly-established federal statutory or constitutional rights of which a reasonably trained police officer would have known. *Harlow v. Fitzgerald*, 457 U.S. at 818–19. As the United States Court of Appeals for the Fourth Circuit restated in *Raub v. Campbell*, a "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." 785 F.3d 876, 881 (2015) (citing *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014)).

Application of the analytical framework for qualified immunity necessarily begins by parsing from the record at hand the specific information known to Deputy Harney at the time of Plaintiff's arrest. To ensure the reliability of the evidence weighed in the analysis, the Court will draw largely from Deputy Harney's testimony during his deposition, which was tested in the crucible of cross-examination. Portions of the transcript of Deputy Harney's deposition taken on November 3, 2015 were appended to each motion for summary judgment and to Plaintiff's Opposition to Motion for Summary Judgment and subsequent Reply.

Deputy Harney provided the following information at this deposition:

(1) He had served ten years as a deputy sheriff with the Spotsylvania County Sheriff's Office. (Def.'s Mem. Support Mot. Summ. J., Ex. D at 11:8–12, ECF No. 165-4.)

(2) Prior to October 5, 2013, he had been dispatched on close to 100 prescription fraud calls. (*Id.* at 13:14–22.) He described his prior training and experience in prescription fraud investigations as "[w]orking with multiple pharmacies and pharmacists in determining and how to read PMPs and how the DEA as well as pharmacies and doctors are supposed to log and record narcotic prescriptions and not supposed to schedule them out 30 days in advance." (*Id.* at 40:25–41:5.)[6]

(3) On the day in question, the CAD system in his vehicle described the pertinent call as a possible prescription fraud at Wal-Mart. The CAD communication was as follows: "PRESCRIPTION FRAUD – CALLER TRYING TO FILL DUPLICATE PRESCRIPTION – ALREADY HAD IT FILLED AT CVS – PHARMACIST CHECKED THEIR SYSTEM – HAS BEEN DOING THIS SINCE APRIL." (Am. Compl. ¶¶ 59–60.)

(4) Deputy Harney placed a telephone call to the pharmacist to confirm the information he had received on his CAD. (*Id.* at ¶¶ 71–75; Pl.'s Mem. Support Mot. Summ. J., Ex. C at 37:9–11, ECF No. 177.) The pharmacist reiterated that it was the

---

[6] Because Deputy Harney was unable to specifically recount details of his prior involvement in prescription fraud calls during discovery, Plaintiff suggests that such background information should be discounted. Deputy Harney indicated in his Objection to Interrogatories that he did not rely on any information gleaned during these investigations in formulating probable cause to arrest Plaintiff. (Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J., Ex. P, ECF No. 184-16.) However, as counsel for Plaintiff acknowledged during oral argument, the prior experience was an element in the analytical framework used to evaluate the circumstances presented at the time of Plaintiff's arrest.

same prescription that had been filled at the CVS in Chatham four days prior. (Def.'s Mem. Support Mot. Summ. J., Ex. D at 37:9–11, 51, 56.)

(5) Based upon his ten years of training and involvement in similar investigations many times before, it led him to believe that "there was possibly a fraudulent transaction going on." (*Id.* at 37:14–19.)

(6) The pharmacist also advised Deputy Harney that Plaintiff had been flagged through the PMP and she had been "doing the same transactions since April of that year." (*Id.* at 38:9–13.)

(7) Deputy Harney suspected that a crime was being committed. "For a controlled substance, through my training and experience, it's supposed to be logged in the DEA logbook, and you're only supposed to be given one prescription at a time for it." (*Id.* at 39:19–23.)

(8) Deputy Harney testified that he did not personally review the PMP information before arresting the Plaintiff. He indicated that only the pharmacist was privy to such information. He therefore relied on the information provided by the pharmacist. (*Id.* at 39:24–40:13.)

(9) Of significance to Deputy Harney was the fact that Plaintiff's name had been flagged in the PMP system. (*Id.* at 41:21–24.)

(10) Deputy Harney did not personally review the prescription or any other documents before arresting Plaintiff, but again relied on information imparted by the pharmacist.[7] (*Id.* at 40:4–13.)

(11) Deputy Harney explained that he did not discuss the allegedly fraudulent prescription with the Plaintiff before her arrest. (Pl.'s Mem. Support Mot. Summ. J., Ex. C at 44:23–45:1.)

(12) Prior to arresting the Plaintiff, Deputy Harney was unsure whether the prescription was a photocopy. (*Id.* at 51:21–23.)

(13) Deputy Harney testified that he believed Plaintiff's name had surfaced in connection with a previous drug case, but she was neither a suspect nor in any way implicated in criminal activity. (Def.'s Mem. Support Mot. Summ. J., Ex. D at 69:6–25.)

(14) Deputy Harney was previously involved in several other cases involving the passing of multiple Schedule I and Schedule II narcotic prescriptions. His initial suspicion that Plaintiff may have been involved in such activity was based on "the shear fact that the totality of the circumstances involved in this case were similar to multiple other cases that I was investigating within the county." (*Id.* at 101:1–102:3.)

(15) Deputy Harney testified that he believed at the time he initially took Plaintiff into custody, she was merely being detained and not arrested. She was a possible suspect. (Pl.'s Mem. Support Mot. Summ. J., Ex. C at 62:9–24.)

---

[7] Deputy Harney attempted to contact the physician who issued the prescription prior to transporting Plaintiff to the magistrate's office. (Pl.'s Mem. Support Mot. Summ. J., Ex. C at 45.)

12

Plaintiff draws the Court's attention to portions of the preliminary hearing transcript (Pl.'s Mem. Support Mot. Summ. J., Ex. B) and the pharmacist Brenda Greer's ("Greer") deposition testimony (Pl.'s Mem. Support Mot. Summ. J., Ex. H) to argue the existence of a genuine dispute of material fact. The alleged dispute, though inconsistent with Plaintiff's own description of facts, focuses on (1) whether or not the pharmacist and Deputy Harney spoke on the phone before he arrived at Wal-Mart on October 5, 2013, and (2) whether or not the pharmacist confirmed the information in the CAD entry received by Deputy Harney concerning "red flags" in the computer system. Deputy Harney portrays Plaintiff's argument as illusory, an attempt to elevate innocent misrecollection to the level of a genuine dispute of material fact.

In her Amended Complaint, Plaintiff herself asserts that Deputy Harney contacted Greer by telephone and that Greer indicated that Plaintiff's PMP history was "raising some red flags." (Am. Compl. ¶¶ 71, 74.) In Deputy Harney's deposition, he states that Greer "advised dispatch as well as me that the name had been flagged in the system, in the PMP system." (Pl.'s Mem. Support Summ. J., Ex. C at 41:21–24.) In Greer's deposition, she indicated that she didn't remember the details of the conversation with Deputy Harney, but did recall that while she did not go into details with him, she did mention her concerns after looking at the PMP as well as red flags or indicators. (Pl.'s Mem. Support Summ. J., Ex. H at 123:19–124:9.) Finally, during the communication with his dispatcher on the day of the incident, Deputy Harney says "I just confirmed with the pharmacist [Greer] it's going to be multiples throughout the county." (Am. Compl., Ex. E at 2.)

13

To support her contention that these discrepancies constitute material disputes of fact, Plaintiff directs the Court's attention to a portion of the pharmacist's testimony during the preliminary hearing on March 24, 2014, in the Spotsylvania County General District Court. During her testimony at that hearing, Greer expressed some doubt over the identity of the person she spoke with on the phone during her conversations on October 5, 2013. She also demonstrated some confusion between her telephone call to the sheriff's office dispatcher and her conversation with Deputy Harney. (Def.'s Mem. Support Summ. J., Ex. C at 25:6–17.) Furthermore, during the preliminary hearing, in response to a paraphrased quote of the pharmacist concerning the red flags, Deputy Harney said "I don't believe she said that to me but she might have said that to the dispatcher, but I don't recall that being said." (Pl.'s Mem in Opp'n to Def.'s Mot. Summ. J., Ex. B at 37:14–20.) Lastly, Plaintiff notes that during her deposition, the pharmacist stated that she only recalled talking to the deputy after Plaintiff was taken into custody. Yet, when viewed in context of the record as a whole, this comment appears to pertain to in person, as opposed to telephonic conversations. (Pl.'s Mem in Opp'n to Def.'s Mot. Summ. J., Ex. F at 120:18–121:2; Def.'s Mem. Support Summ. J., Ex. E at 123:19–124:24); *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Whether characterized as a true dispute of fact or an innocent failure of recollection, these discrepancies fall short of the type of material controversy which would foreclose summary judgment on the issue of qualified immunity.[8] "When the

---

[8] In *Christovich v. Pierce*, the U.S. Court of Appeals for the Fourth Circuit restated with approval the enshrined language of the innocent misrecollection jury instruction. "An innocent

14

moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 380 (internal citations omitted).

Although the United States Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001) mandated a two-facet inquiry for resolving government officials' qualified immunity claims, this regimented approach was abolished in *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). District courts may now address the two determinative questions, (1) whether the plaintiff has established a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged violation, in the "order . . . that will best facilitate the fair and efficient disposition of each case." *Id.* at 242 (internal citations omitted). The issue of whether Deputy Harney had probable cause to arrest the Plaintiff is admittedly a close question.[9] But as the Supreme Court pointed out in *Butz v. Economou*, qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law." 438 U.S. 478, 507 (1978); *see also Pearson*, 555 U.S. at 231. Reasonable minds can certainly differ in assessing probable cause during the course of a rapidly evolving criminal investigation. Consequently, the law does not require scientific precision.

---

misrecollection, just like the failure of recollection, is not an uncommon human experience. In weighing the effect of any discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood." 59 Fed. Appx. 543, 549 (4th Cir. 2003). Although this instruction pertains to credibility determinations by a trier of fact, the wisdom imparted is informative.
[9] "A finding of probable cause is based upon a practical assessment of the totality of the circumstances." *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1998). It involves "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (internal quotation marks and citations omitted).

15

Qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). The protection extends to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Indeed, as we have emphasized repeatedly, '[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Raub*, 785 F.3d at 881 (quoting *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 266 (4th Cir. 1998)). The Supreme Court has also cautioned that the requisite inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citations omitted). Such specificity is especially important in the Fourth Amendment context where the court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Saucier*, 533 U.S. at 205).

Qualified immunity does not turn on a retrospective comparison of Deputy Harney's actions with a theoretical textbook investigation. *See Abney v. Coe*, 493 F.3d 412, 419 (4th Cir. 2007). As Chief Judge Traxler commented in *Doe v. Broderick*:

> Qualified immunity thus provides a 'safe-harbor' from tort damages for police officers performing *objectively* reasonable actions in furtherance of their duties. This 'safe-harbor' ensures that officers will not be liable for "bad guesses in gray areas" but only for "transgressing bright lines." Of course, officers are not afforded protection when they are "plainly incompetent or . . . knowingly violate the law." But, in gray areas where the law is unsettled or murky, qualified immunity affords protection to an officer who takes an action that is not clearly forbidden – even if the action is later deemed wrongful. Simply put, qualified immunity exists to protect

16

those officers who reasonably believe that their actions do not violate federal law.

225 F.3d 440, 453 (4th Cir. 2000) (emphasis in original) (citations omitted).

There may well be a plausible argument that Deputy Harney misinterpreted portions of federal regulations governing the issuance of Schedule I and Schedule II narcotic drugs. However, a mistake of law does not necessarily preclude entitlement to qualified immunity. Moreover, even if the information of which Deputy Harney had knowledge at the time of Plaintiff's arrest fell short of probable cause, he certainly had reasonable suspicion that questionable activity was afoot.[10] This belief was formed based upon the information and impressions conveyed by a licensed pharmacist with access to the PMP data base. Such reliance was certainly reasonable. Even the Spotsylvania County Circuit Court judge, who concluded that Deputy Harney lacked probable cause, acknowledged the presence of actionable suspicion.

Accordingly, the dispositive question is whether Deputy Harney's actions violated Plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A right is clearly established only if its contours are sufficiently clear that "a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640. "In other words, 'existing precedent must have placed a statutory or constitutional

---

[10] "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Probable cause is "a fluid concept that cannot be reduced to a neat set of rules." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (internal quotation marks and citations omitted).

question beyond debate.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (quoting *al-Kidd*, 563 U.S. at 741). In canvassing the legal landscape for pertinent precedent governing Deputy Harney's actions on October 5, 2013, it is important to focus on the critical question of whether he acted reasonably in light of the particular circumstances that he faced. Additionally, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citations omitted).

After carefully mining Fourth Amendment jurisprudence, including all cases cited by both parties, this Court finds no clearly established authority placing the statutory or constitutional question of the legality of Plaintiff's arrest beyond debate. The Court is not convinced that *Williams v. Commonwealth* satisfies that standard. Even viewing the evidence in the light most favorable to Plaintiff, as this Court must at this juncture, the totality of circumstances place the legality of Plaintiff's arrest squarely within the type of gray area warranting qualified immunity.

Accordingly, Deputy Harney's Second Motion for Summary Judgment will be granted, and Count XI of the Amended Complaint will be dismissed with prejudice. Plaintiff's Motion for Summary Judgment will be denied.

An appropriate Order will accompany this Memorandum Opinion.

                                     /s/
                             Henry E. Hudson
                             United States District Judge

Date: May 16, 2016
Richmond, VA